# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| AMAZON CONTENT SERVICES LLC; COLUMBIA PICTURES INDUSTRIES, INC.; DISNEY ENTERPRISES, INC.; NETFLIX US, LLC; NETFLIX WORLDWIDE ENTERTAINMENT, LLC; PARAMOUNT PICTURES CORPORATION; SONY PICTURES ANIMATION INC.; UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP; WARNER BROS. ENTERTAINMENT INC., | § § § § § § § § § § § § | |
| **Plaintiffs,** | § § | **CIVIL ACTION NO. 3:24-cv-733** |
| vs. | § § § | **JURY TRIAL DEMANDED** |
| WILLIAM FREEMON; FREEMON TECHNOLOGY INDUSTRIES LLC; INSTANTIPTV.NET; STREAMINGTVNOW.COM; STREAMINGTVNOW.NET; TVNITRO.NET; CASHAPPIPTV.COM; LIVETVRESELLERS.COM; STNCLOUD.LTD; AND STNLIVE.LTD, | § § § § § § § § § | |
| **Defendants.** | § | |

## COMPLAINT

Plaintiffs assert the following claims for direct and secondary copyright infringement under the Copyright Act (17 U.S.C. § 101 *et seq*.) against William Freemon and his company, Freemon Technology Industries LLC (together, "Freemon"); and instantiptv.net, streamingtvnow.com, streamingtvnow.net, tvnitro.net, cashappiptv.com, livetvresellers.com, stncloud.ltd, and stnlive.ltd ("Infringing Domain Defendants") (together with Freemon, "Defendants"), which cause irreparable harm to Plaintiffs. Plaintiffs allege the facts set forth below on personal knowledge as to themselves and on information and belief as to others.

# I.
## INTRODUCTION

1.      Mass copyright infringement is a worldwide problem that seriously harms Plaintiffs, the U.S. economy, and economies around the globe.  Plaintiffs and their affiliates are producers and distributors of filmed entertainment in the theatrical and home entertainment industry, and they create many of the world's most popular and critically acclaimed movies and television shows.  Beyond their inherent artistic and entertainment value, these copyrighted works contribute substantially to the U.S. economy.  The American film and television industry alone supports 2.4 million jobs, pays out $186 billion in total wages, and comprises more than 122,000 businesses in all 50 states (92% of which are small businesses employing fewer than ten people).[1]

2.      But copyright infringers pose a serious threat to this creative marketplace.  In 2022, there were an estimated 191.8 *billion* visits to film and TV piracy sites globally.[2]  A recent U.S. Chamber of Commerce report estimates that global online theft of copyrighted movies and TV shows costs the U.S. economy at least $29.2 billion in lost revenue each year.[3]  Mass copyright infringement has also been estimated to reduce industry jobs by between 230,000 and 560,000 jobs in just one year.[4]

3.      William Freemon is one such mass infringer.  Specifically, Freemon operates an extensive and commercially scaled network of illegal streaming services that offers unauthorized access to live channels and video-on-demand streams of Plaintiffs' copyrighted movies and TV shows.  Freemon makes money by selling subscriptions to his infringing services directly to the

---

[1] *The American Motion Picture and Television Industry: Creating Jobs, Trading Around the World*, MOTION PICTURE ASSOCIATION (2023), https://www.motionpictures.org/wp-content/uploads/2023/01/MPA_US_Economic_Contribution_2021_Final.pdf.

[2] *2022 Movie & TV Piracy Trends Worldwide*, ALLIANCE FOR CREATIVITY AND ENTERTAINMENT (2023), https://www.alliance4creativity.com/wp-content/uploads/2023/12/WDWK-2022-worldwide-071223.pdf.

[3] DAVID BLACKBURN ET AL., U.S. CHAMBER OF COMMERCE, IMPACTS OF DIGITAL VIDEO PIRACY ON THE U.S. ECONOMY ii (June 2019), https://www.theglobalipcenter.com/wp-content/uploads/2019/06/Digital-Video-Piracy.pdf.

[4] *Id*. at 14.

public, but he pays nothing to Plaintiffs for the copyrighted works he exploits.  In addition to offering infringing streams directly to the public, Freemon also recruits "resellers" who sell subscriptions to their customers—expanding the reach of Freemon's infringing enterprise.

4.      Freemon's piracy is willful.  Freemon profits from exploiting the rights to many of Plaintiffs' most popular movies and TV series—for example, Universal's highly popular, Academy Award-winning, recent release *Oppenheimer*:



*Figure 1: Universal's* Oppenheimer *illegally streaming through Freemon's streaming site.*

5.      Freemon has a long history of illegally profiting from content theft.  He has engaged in mass infringement since at least 2016 when he started selling "jailbroken" streaming devices that were illegally modified to allow users to access unauthorized content on their televisions.  From there, Freemon moved on to illicit streaming services that charge users to stream popular and unlicensed movies, shows, and television channels.

6.      Freemon now operates a ring of these illegal sites and services, which include both (1) direct-to-consumer services and (2) a reseller program (recruiting others who then sell subscriptions to consumers).  For example, Streaming TV Now is one of Freemon's most popular illegal streaming services.  In exchange for a subscription fee of $20 per month to $150 per year, Freemon provides his subscribers with access to over 11,000 illegal channels and a video-on-demand service that offers over 27,000 movies and over 9,000 TV series.  This is infringement of

Plaintiffs' copyrighted works on a massive scale.  Because Freemon has sidestepped the obligation to pay for works for streaming—and therefore does not abide by any restrictions on use or pay any fees—he competes on unfair terms.  Freemon has amassed an enormous library of content in a single location (disregarding ownership rights or exclusive terms that would normally apply) and offers consumers discounted prices (because he pays nothing for the content he steals).  This undercutting harms Plaintiffs' and their legitimate business, streaming or otherwise.

7.     In addition to operating direct-to-consumer services like Streaming TV Now, Freemon also actively recruits others to join his illegal network—exacerbating the harm. Freemon's reseller site boasts that "you can make a lot of money reselling IPTV" and offers users the chance to "rebrand [his] services and sell it as [their] very own IPTV service[.]"[5]

8.     Freemon knows he has no right to do any of this.  On the contrary, he has demonstrated a willful disregard for his illegal actions.  Plaintiffs tried to get Freemon to stop infringing without the need for court intervention.  Freemon, however, refused to cooperate in shutting the infringing services down.

9.     Freemon's ongoing infringement steals consumers and revenue from Plaintiffs and usurps Plaintiffs' right to control their copyrighted works and right to determine the terms on which they are provided to consumers.  Without intervention, these harms will only grow as Freemon and those in concert with him expand both their customer bases and their illegal content offerings.

## II.
## <u>PLAINTIFFS</u>

10.     Plaintiff Amazon Content Services LLC ("Amazon") is a corporation duly organized under the laws of the State of Delaware with its principal place of business in Seattle, Washington.  Amazon owns or controls the copyrights or exclusive rights in the content that it or its affiliates produce or distribute.

---

[5] *Purchase New/Existing Reseller Package*, LIVE TV RESELLERS, https://livetvresellers.com (last visited Mar. 26, 2024).

11.     Plaintiff Columbia Pictures Industries, Inc. ("Columbia") is a corporation duly incorporated under the laws of the State of Delaware with its principal place of business in Culver City, California.  Columbia owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute.

12.     Plaintiff Disney Enterprises, Inc. ("Disney") is a corporation duly incorporated under the laws of the State of Delaware with its principal place of business in Burbank, California. Disney owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute.

13.     Plaintiff Netflix US, LLC ("Netflix") is a limited liability company duly organized under the laws of the State of Delaware with its principal place of business in Los Angeles, California.  Netflix owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute.

14.     Plaintiff Netflix Worldwide Entertainment, LLC ("Netflix Worldwide") is a limited liability company duly organized under the laws of the State of Delaware with its principal place of business in Los Angeles, California.  Netflix Worldwide owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute.

15.     Plaintiff Paramount Pictures Corporation ("Paramount") is a corporation duly incorporated under the laws of the State of Delaware with its principal place of business in Los Angeles, California.  Paramount owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute.

16.     Plaintiff Sony Pictures Animation Inc. ("SPA") is a corporation duly incorporated under the laws of the State of California with its principal place of business in Culver City, California.  SPA owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute.

17.     Plaintiff Universal City Studios Productions LLLP ("Universal") is a limited liability limited partnership duly organized under the laws of the State of Delaware with its

principal place of business in Universal City, California.  Universal owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute.

18.     Plaintiff Warner Bros. Entertainment Inc. ("Warner Bros.") is a corporation duly incorporated under the laws of the State of Delaware with its principal place of business in Burbank, California.  Warner Bros. owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute.

### III.
### THE COPYRIGHTED WORKS

19.     Exhibit A to this Complaint contains a representative list of feature-length motion pictures and television shows, along with their registration numbers, the registered copyright owner(s), and the date of registration, that Freemon has infringed (the "Copyrighted Works").[6] Plaintiffs have timely obtained Certificates of Copyright Registration for their Copyrighted Works.

### IV.
### DEFENDANTS

20.     Defendant William Freemon is an individual residing in Dallas, Texas who may be served with process at, upon information and belief, 1528 Meadow Valley Lane, Dallas, Texas 75232.  The available evidence shows that Freemon previously or currently owns and operates online infringing services including but not limited to those branded Streaming TV Now, Instant IPTV, TV Nitro, and Live TV Resellers (together, the "Infringing Services").  Freemon uses various websites and domains to offer the Infringing Services, including the following: instantiptv.net, streamingtvnow.com, streamingtvnow.net, tvnitro.net, cashappiptv.com, livetvresellers.com, stncloud.ltd, and stnlive.ltd (together, the "Infringing Domains").  The Infringing Services provide access to live channels through an internet protocol television ("IPTV") service, as well as over 27,000 movies and 9,000 TV series through a video-on-demand ("VOD") service.

---

[6] The Copyrighted Works include but are not limited to the representative list of infringed works set forth on Exhibit A.  Plaintiffs will supplement this list as appropriate such as, for example, to calculate damages.

21.     Freemon Technology Industries LLC, is a Texas limited liability company with its principal place of business at 1528 Meadow Valley Lane, Dallas, Texas 75232.  Freemon Technology Industries LLC is an alter ego of Freemon, who is the company's sole member, because Freemon uses the company to accept payments for Streaming TV Now, among other operations of the Infringing Services.

22.     To the extent the Infringing Services are not operated by Freemon, the Infringing Domain Defendants—instantiptv.net, streamingtvnow.com, streamingtvnow.net, tvnitro.net, cashappiptv.com, livetvresellers.com, stncloud.ltd, and stnlive.ltd—are the individuals, business entities, or unincorporated associations offering for sale the Infringing Services through the Infringing Domains and selling the Infringing Services to residents in the United States, including in this District.

**V.**
**JURISDICTION & VENUE**

23.     This Court has original subject matter jurisdiction over Plaintiffs' federal copyright claims pursuant to 28 U.S.C. §§ 1331, 1338(a), and 17 U.S.C. § 501(b).

24.     Freemon is subject to personal jurisdiction because he resides in Dallas, Texas, and he directed his infringement of Plaintiffs' Copyrighted Works from this jurisdiction.

25.     Defendants are also subject personal jurisdiction because Defendants know that their unauthorized exploitation of the Copyrighted Works harms Plaintiffs in Texas, they are entering into contracts with Texas residents, they are directing the infringing activity from this jurisdiction, and they are directing the illegal revenues to this jurisdiction.

26.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), 1400(a).

**VI.**
**RELEVANT FACTUAL BACKGROUND**

A.     **Plaintiffs and Their Copyrighted Works**

27.     Plaintiffs and/or their affiliates produce and distribute a significant portion of the world's most sought-after, critically acclaimed, and award-winning movies and television

programs. Plaintiffs' ability to invest in and create new works depends upon the protection and enforcement of their rights under copyright law.

28.    Plaintiffs own or hold the exclusive U.S. rights to, among other things, reproduce, distribute, and publicly perform (including by means of streaming those works over the internet) the Copyrighted Works.

29.    Numerous legitimate channels exist for Plaintiffs' Copyrighted Works. Plaintiffs, themselves or through their affiliates, authorize the distribution and public performance of the Copyrighted Works in various formats and through multiple distribution channels, including, by way of example: (a) through authorized cable and direct-to-home satellite services (including basic, premium, and "pay-per-view"); (b) through authorized internet VOD services, including Amazon Prime, Disney+, Apple's iTunes, Google Play, Netflix, Paramount+, and Peacock; (c) through authorized internet or over-the-top ("OTT") streaming services, including those offered by Hulu TV, Fubo TV, Sling TV, YouTube TV, and others; (d) for private home viewing on DVD, Blu-ray, and UHD discs; (e) for exhibition in theaters; (f) for pay television; and (g) for over-the-air broadcast television.

30.    Plaintiffs have not authorized Freemon to stream any of the Copyrighted Works, or to exercise any of Plaintiffs' other exclusive rights under the Copyright Act, 17 U.S.C. § 106.

**B.    Freemon's Infringement of Plaintiffs' Copyrighted Works**

31.    Freemon has a long history of brazen disregard for copyright laws, and his early foray into internet piracy is the first link in the chain leading to his current web of illegal services.

32.    Beginning in 2016 and continuing through 2019, Freemon sold illegally modified Fire TV Stick devices. These devices connect to a regular TV and allow customers to access unauthorized content.

33.    Freemon publicly advertised these devices on his personal social media pages. He also knew the devices he was selling were illegal—he specifically advertised that they were

"loaded" and "jailbroken" (i.e., illegally modified with software that accesses unauthorized content) in his social media posts.



*Figure 2: Freemon advertises "[l]oaded" and "[j]ailbroken" Fire TV Stick for $70 each on his personal Facebook page.*



*Figure 3: Freemon advertises Fire TV Sticks for $85 each (or two for $150) on his personal Twitter page.*

34.    Freemon sold these illegal devices through two websites: (1) firesticksloaded.biz and (2) firesticksloaded.com.

35.    The registration record for firesticksloaded.biz reflects that it was created in December 2016 and William Freemon was the registrant.  The address listed (1528 Meadow

Valley Ln, Dallas TX 75232) matches the principal place of business registration for Freemon Technology Industries LLC, and is believed to be Freemon's current residence.



```
Domain Name: firesticksloaded.biz
Registry Domain ID: D73540184-BIZ
Registrar WHOIS Server:
Registrar URL: whois.publicdomainregistry.com
Updated Date: 2017-01-03T01:36:31Z
Creation Date: 2016-12-17T07:20:46Z
Registry Expiry Date: 2017-12-16T23:59:59Z
Registrar: PDR Ltd. d/b/a PublicDomainRegistry.com
Registrar IANA ID: 303
Registrar Abuse Contact Email: abuse-contact@publicdomainregistry.com
Registrar Abuse Contact Phone:
Domain Status: clientTransferProhibited https://icann.org/epp#clientTransferProhibited
Registry Registrant ID: C73540183-BIZ
Registrant Name: William Freemon
Registrant Organization: Firesticks Loaded
Registrant Street: 1528 Meadow Valley Ln
Registrant Street:
Registrant Street:
Registrant City: Dallas
Registrant State/Province: TX
Registrant Postal Code: 75232
Registrant Country: US
```

*Figure 4: December 2016 Whois record listing Freemon as the registrant for firesticksloaded.biz (red box added by Plaintiffs for emphasis).*

36.    Both sites are now offline, but according to publicly available information the domains were previously hosted at the Internet Protocol address ("IP" address) 5.183.209.216.  An IP address is the unique label that identifies a device connected to the internet.  Like a street address tells mail carriers where to deliver mail, an IP address tells computers and other devices where to send and receive information over the internet.  Any device that connects to the internet, such as a computer or a server,[7] gets assigned an IP address.  If one server hosts multiple websites, the websites all share the server's IP address.  Here, Freemon's websites shared the same IP address, which in turn is associated with the commercial hosting provider, Amarutu Technology Ltd.[8]

37.    Through this IP address, Plaintiffs have been able to uncover Freemon's web of online infringing domains and services, including but not limited to the following branded services—all of which have been hosted at the same IP address and offer similar infringing content:

---

[7] A server is essentially a specialized computer that is designed to provide resources, data, or content to other computers over a network.

[8] A hosting provider manages the server and makes it accessible for customers to host their websites and services.

(1) Streaming TV Now; (2) Instant IPTV; (3) Cash App IPTV; and (4) TV Nitro.  In addition to these direct-to-consumer services, Freemon also operates a reseller business called Live TV Resellers (available at livetvresellers.com), which has similarly been hosted at the same IP address and refers users to Streaming TV Now.[9]

38.    Other evidence also links Freemon to the Infringing Services.  The Streaming TV Now service linked to Freemon's YouTube account @williamfreemon3378, where Freemon explained how to use the service:



*Figure 5: YouTube video from William Freemon's YouTube channel linked on the streamingtvnow.com website.*

39.    Additionally, Freemon's YouTube account featured videos of Freemon teaching customers how to install and navigate one of his other infringing services, TV Nitro.

---

[9] Some of the domains referenced throughout this Complaint have been hosted at different IP addresses at different points in time.  The IP address associated with a domain can change for various reasons, many of which are merely technical and have nothing to do with domain ownership, such as: server migration, server upgrades and maintenance, or load balancing. Nonetheless, the fact that most of these domains all shared the same 5.183.209.216 IP address (which was publicly registered to Freemon) evidences that Freemon owns or operates all of them— an inference that is not undermined by subsequent IP address changes.  This is particularly true where, as here, many of the Infringing Domains continue to be associated with the same hosting provider (Amarutu Technology Ltd.).

40.     Freemon eventually removed these incriminating YouTube videos after Plaintiffs contacted him about his infringement—presumably to obscure his connection to his network of infringing sites.  These YouTube videos—and their subsequent removal—nonetheless provide further evidence that Freemon is behind this web of services *and* that he knows he is committing infringement.

41.     Through the Infringing Services, Freemon violates Plaintiffs' rights in the Copyrighted Works on a massive scale.  Combined, Freemon's direct-to-consumer sites received nearly 500,000 visits over the last year, with an average of over 45,000 visits per month.  These numbers likely understate the substantial actual traffic to the Infringing Services because once someone has subscribed, they access the services through a separate site and a video player and do not need to revisit the main domains.  Even a conservative estimate—for example, that between one and five percent of the site visits result in the purchase of an annual subscription—would mean Freemon is making over six figures, and potentially in the low millions of dollars, from illegally streaming the Copyrighted Works.[10]

**i.     Streaming TV Now**

42.     Freemon's most popular illegal streaming service is currently Streaming TV Now, which can be accessed at streamingtvnow.com.[11]

43.     Streaming TV Now has been active since December 2020.  The streamingtvnow.com domain receives an average of about 13,700 monthly visitors (over 6,000 of which are unique visits).

44.      Streaming TV Now claims to offer subscribers over 11,000 live channels through its IPTV service, as well as over 27,000 movies and 9,000 TV series through its VOD service. These massive IPTV and VOD libraries provide subscribers with unauthorized access to thousands

---

[10] Assuming between 1% and 5% of the 500,000 annual visits convert to annual subscriptions at $150 per year leads to estimated income of $750,000 to $3,750,000 annually.

[11] Additionally, the affiliated domain streamingtvnow.net refers users to streamingtvnow.com.

of Plaintiffs' Copyrighted Works, a small representative sample of which are included with this Complaint in Exhibit A.

45.    Users can access the Streaming TV Now service by signing up for a subscription at streamingtvnow.com.  The home page—instructing users to pay only with CashApp or Bitcoin— is reflected below:



*Figure 6: Streamingtvnow.com landing page.*

46.    Freemon offers customer subscription packages for Streaming TV Now at prices ranging from $20 per month to $150 per year—depending on the package and billing cycle selected.  The money goes to Freemon.  As depicted below, a user paying through CashApp is directed to send $20 USD to the CashApp handle "$ftindustries," which stands for Freemon Technology Industries LLC.



*Figure 7: Streamingtvnow.com directing CashApp payments to $ftindustries.*

47.     After purchasing a subscription, customers receive a login and can then stream Plaintiffs' Copyrighted Works (i.e., watch the pirated movies or TV shows) through the Streaming TV Now Webplayer or other applications that download directly onto smart TVs, computers, and mobile devices.[12]

48.     The Streaming TV Now Webplayer is available at stncloud.ltd.  The Webplayer interacts with stnlive.ltd to provide users with access to infringing streams.  The "stn" acronym in the domains references the first letters of "Streaming TV Now."

49.     When accessing Streaming TV Now, Freemon's customers first see the option to access "Live TV," a link housing Freemon's IPTV offerings, or alternatively "Movies" or "Series" which represent libraries of VOD content.



*Figure 8: Streaming TV Now Webplayer.*

50.     Streaming TV Now subscribers who select Live TV have at their fingertips an enormous collection of television channels.  As noted, Streaming TV Now claims to offer a staggering number of channels, totaling over 11,000 channels from across the globe.  The channels

---

[12] The service can be accessed by downloading third-party video players available online and through application stores (e.g., the Google Play Store).  Users access Freemon's infringing content through these video players by entering their Streaming TV Now credentials and the following server address, which serves as a "portal" between the player and Freemon's infringing content: http://stnlive.ltd:80.

that Freemon's IPTV Service offers include major networks like ABC and BBC, as well as paid channels like BET, MTV, and USA Network, and premium channels like HBO.

51.     Freemon's live television channels are streamed contemporaneously with the original source of the telecast.  For example, television programs airing on channels such as ABC and USA Network also appear on Streaming TV Now, where Freemon deploys those programs for streaming in high definition and with little to no delay.  This contemporaneous streaming enables Streaming TV Now subscribers to view new releases and exclusive programming simultaneously with the original telecast, but without making a payment to a legitimate service.

52.     Once a subscriber clicks a channel offering, Freemon (through his domain stnlive.ltd) deploys the channel's content for streaming to the subscriber in real time.  On any given day, Freemon deploys a stream for thousands of Plaintiffs' Copyrighted Works to subscribers through Streaming TV Now.  Because Freemon provides localized versions of channels across time zones, a particular Copyrighted Work may appear multiple times per day, such that subscribers can access the Copyrighted Works at their convenience.  For example, the screen capture below shows Warner Bros.' *Shazam! Fury of the Gods* streaming live through Streaming TV Now.



*Figure 9: Example of IPTV streaming of Warner Bros.'* Shazam! Fury of the Gods.[13]

---

[13] At the time of filing this Complaint, the Streaming TV Now Webplayer was not working.  The screen capture of *Shazam! Fury of the Gods* was taken using Streaming TV Now's connection through a third-party application.

53.    Streaming TV Now also offers a video-on-demand library.  Through the VOD library, subscribers can search for and view thousands of Copyrighted Works instantly as they would on Netflix or Amazon Prime.  Because Freemon's service is unauthorized, however, Freemon offers a more comprehensive library of infringing content in a single location.  The video-on-demand service offers over 27,000 movies and over 9,000 TV series.

54.    Freemon, or those in concert with him, update Streaming TV Now's library with illegal copies of the latest and most popular releases, including Copyrighted Works such as Universal's *Oppenheimer*, Columbia's *Gran Turismo*, and Disney's *The Little Mermaid*.  The screen captures below show Freemon's video-on-demand service offering these popular titles for streaming:



*Figure 10: Universal's* Oppenheimer *in Streaming TV Now's VOD library.*



*Figure 11: Columbia's* Gran Turismo *in Streaming TV Now's VOD library.*



*Figure 12: Disney's* The Little Mermaid *in Streaming TV Now's VOD library.*

55. The result is that Freemon illicitly profits from offering his subscribers new and popular Copyrighted Works for on-demand streaming. As just one example, shown in **Figure 10** above, the highly popular, award-winning, recent release from Universal, *Oppenheimer*, is available through Streaming TV Now.

### ii.   Other IPTV Services

56. Streaming TV Now is just one example of Freemon's various infringing domains and services. In addition to Streaming TV Now, Freemon owns or operates (or previously owned and operated) at least three other unauthorized streaming services:

- Instant IPTV (instantiptv.net);
- Cash App IPTV (cashappiptv.com); and
- TV Nitro (tvnitro.net).

57. These services and their domains were similarly hosted at the same IP address as Streaming TV Now (5.183.209.216), which was linked to Freemon through his illegal Fire TV Sticks business.

58. **Instant IPTV** (instantiptv.net) has been active since June 2021 and merely repackages the Streaming TV Now service. The domain leads users to a home page that is nearly indistinguishable from the Streaming TV Now home page. The Instant IPTV home page boasts:

"Streaming TV Now is the fastest growing IPTV provider.  Enjoy instant activations, HD streams, premium apps, and more."  Instant IPTV receives an average of about 13,200 visitors each month.



*Figure 13: Landing page for instantiptv.net.*

59.    **Cash App IPTV** (cashappiptv.com) leads users to a different home page, but this domain nonetheless features the same pricing structure and the same Webplayer as the other domains, confirming that it is part of Freemon's network.  Cash App IPTV, which has been active since September 2022, similarly boasts of 11,000 channels and access to video-on-demand movies and shows.



*Figure 14: Cash App IPTV landing page.*

60.   **TV Nitro** appears to be Freemon's original infringing IPTV service, and operated primarily between 2019 and 2021.  TV Nitro offers the same content as Streaming TV Now and, again, shared the same IP address.  TV Nitro was a popular service that provided access to a vast library of thousands of channels and received an average of about 11,000 unique monthly visitors during this time period.

61.   TV Nitro was inactive for about two years, during which time its domain redirected users to Instant IPTV and Freemon's reseller service Live TV Resellers.  The image below shows the TV Nitro domain directing customers to Instant IPTV, boasting that the new service offers more infringing content and allows it to be streamed on four devices at once:



*Figure 15: tvnitro.net referring users to instantiptv.net and to livetvresellers.com.*

62.     Recently, however, the TV Nitro service was reactivated.  As of January 23, 2024, TV Nitro is back up and selling subscriptions:



*Figure 16: Tvnitro.net landing page, which shows it was recently reactivated (time/date stamp added by Plaintiffs).*

### iii.    Live TV Resellers

63.     In addition to offering direct-to-consumer infringing services such as Streaming TV Now and other similar services, Freemon also operates Live TV Resellers (livetvresellers.com), through which Freemon recruits resellers to expand his illicit network of digital piracy.

64.     Live TV Resellers has been hosted at the IP address 5.183.209.216, the same IP address used by Streaming TV Now and linked to Freemon through his illegal Fire TV Sticks business.

65.     The landing page of livetvresellers.com invites users to purchase reseller packages, advertising that users can "test the service" through a trial streaming subscription from streamingtvnow.com:



*Figure 17: Landing page for livetvresellers.com, directing users to streamingtvnow.com.*

66.     The website offers reseller subscription packages ranging from $250 for 50 credits to $3,000 for 1,000 credits.  Credits can be traded in for subscriptions to Streaming TV Now at a discounted rate compared to what end-users pay directly, allowing the reseller to earn a profit through selling subscriptions.



*Figure 18: Reseller subscriptions available at livetvresellers.com.*

67.     Live TV Resellers boasts that resellers "can make a lot of money" reselling IPTV services.  The main page states:

> IPTV subscriptions are very popular right now and the market is expanding really
> fast!  The huge demand for quality live television at a low cost means that you can

make a lot of money reselling IPTV.  The most challenging part for resellers is finding a provider with high-quality service.

68.     Under the tab "Reseller Information," Freemon further entices readers to engage in online infringement for profit and expand the reach of his illicit services.  In response to the question "Why Should I Become a Reseller?," the website states:

> The first thing that comes to mind when becoming a reseller is money!  That's why we make sure to offer only the best quality channels and streams out there to keep our loyal customers coming back for more.
>
> Your ability to resell depends on how well you can market IPTV.  If you are willing to advertise and market your product correctly, you will see instant results and profit.

69.     Through this reseller service, Freemon offers the technical infrastructure to operate even *more* illegal streaming services, further expanding the reach of his illegal network.

## C.   Plaintiffs Attempted to Resolve the Issue Without Court Intervention, but Freemon Has Refused to Cooperate

70.     In light of the strong evidence linking Freemon to continuous and repeated infringement, Plaintiffs sent Freemon a notice letter in February 2023 demanding that Freemon cease operating the Infringing Services.

71.     Freemon was not cooperative.  He did not take down the Infringing Services and instead offered unsubstantiated claims that he transferred the associated domains.

72.     Plaintiffs spent months negotiating with Freemon.  Based on the lack of substantial change to the Infringing Services in the intervening times, including that the respective main domains are still hosted with the same hosting provider (Amarutu Technology Ltd.), Freemon is likely still controlling the Infringing Domains.

73.     Freemon's evasiveness is particularly concerning in light of his long history of willful infringement.  As detailed above, Freemon began selling illegal Fire TV Sticks as early as 2016, which he openly advertised as "jailbroken."  He has since spent *years* operating a web of illegal yet popular IPTV services and deriving illicit profits from selling access to thousands of

Plaintiffs' Copyrighted Works.  He also posted videos on his YouTube page teaching others about online piracy, which, tellingly, he removed only after Plaintiffs contacted him.

74.     Freemon is liable for the infringement described herein.  Either he continues to operate the Infringing Services, or he has enabled infringement by third parties by knowingly transferring Infringing Services.

## VII.
## CAUSES OF ACTION

### COUNT I
### DIRECT COPYRIGHT INFRINGEMENT
### [Against All Defendants]

75.     Plaintiffs incorporate herein by reference each and every averment contained in paragraphs 1 to 74 inclusive.

76.     Under Section 106 of the Copyright Act, Plaintiffs own the exclusive rights in their works, including, among others, to reproduce and publicly perform their Copyrighted Works.

77.     Plaintiffs have not authorized Defendants to exercise any of Plaintiffs' exclusive rights.

78.     Defendants have infringed and continue to infringe Plaintiffs' Copyrighted Works by violating Plaintiffs' exclusive rights to reproduce the Copyrighted Works.  Without Plaintiffs' authorization, Freemon and the Infringing Domain Defendants make copies of Plaintiffs' Copyrighted Works to amass a video-on-demand library that can then be streamed through their Infringing Services.  This infringement includes those works contained on the representative list of infringed works attached at Exhibit A.

79.     Defendants have infringed and continue to infringe Plaintiffs' Copyrighted Works by violating Plaintiffs' exclusive rights to publicly perform the Copyrighted Works.  Without Plaintiffs' authorization, Defendants publicly perform Plaintiffs' Copyrighted Works, including those works contained on the representative list of infringed works attached at Exhibit A, by transmitting performances of the Copyrighted Works over the internet to subscribers of the Infringing Services.

23

80.     Defendants' acts of infringement are willful, deliberate, and committed with prior notice and knowledge of Plaintiffs' Copyrighted Works. Each Defendant willfully, wantonly, and in conscious disregard and intentional indifference to the rights of Plaintiffs made and distributed, caused to be made and distributed, and aided, abetted, contributed to, and participated in the unauthorized making and distribution of the Infringing Services in the United States, including this District.

81.     Each Defendant either knew, or should have reasonably known, that Plaintiffs' Copyrighted Works were protected by copyright and that their actions infringed on Plaintiffs' copyrights. Each Defendant continues to infringe upon Plaintiffs' rights in and to the various Copyrighted Works.

82.     As a direct and proximate result of the infringements by Defendants, Plaintiffs are entitled to damages and Defendants' profits in amounts to be proven at trial.

83.     Pursuant to 17 U.S.C. § 503 and at their election, Plaintiffs are entitled to an order that Defendants' infringing goods and articles be impounded and destroyed.

84.     Alternatively, at their election, Plaintiffs are entitled to statutory damages, up to the maximum amount of $150,000 per infringed work by virtue of Defendants' willful infringement, or for such other amounts as may be proper under 17 U.S.C. § 504.

85.     Plaintiffs further are entitled to recover their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

86.     As a direct and proximate result of the foregoing acts and conduct, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, Defendants will continue to infringe Plaintiffs' rights in the Copyrighted Works.  Plaintiffs are entitled to injunctive relief under 17 U.S.C. § 502 to prevent or restrain infringement of the copyrights, including enjoining any use or exploitation by Defendants of their Infringing Services.

## COUNT II
### CONTRIBUTORY COPYRIGHT INFRINGEMENT
### [Against Freemon Defendants]

87.     Plaintiffs incorporate herein by reference each and every averment contained in paragraphs 1 to 74 inclusive.

88.     With respect to all incidents of infringement as to which Freemon claims that third parties, and not Freemon himself, are directly liable for infringing Plaintiffs' exclusive rights under the Copyright Act, Freemon is knowingly and materially contributing to such infringement.

89.     Freemon has actual knowledge of infringement by third-party subscribers. Freemon systematically offers for sale thousands of live television channels containing Copyrighted Works that can only be lawfully accessed through a limited number of legitimate services, in specific geographic regions, and in specific content packages.  Freemon knows that third parties are not authorized to reproduce Plaintiffs' Copyrighted Works and are not authorized to publicly perform Copyrighted Works by streaming these channels.  Still, Freemon sells access to these streams to his own subscribers.  He also facilitates access to the streams through his domain stnlive.ltd, which, as explained above, operates as a portal that connects the user to the content source's URL.  Freemon knows, from among other sources his correspondence with Plaintiffs, that his subscribers have no authorization to receive the streams of the Copyrighted Works he provides to those subscribers.

90.     Freemon materially contributes to the infringement of the third-party subscribers. Freemon configures and promotes the use of the Infringing Services (including both IPTV and VOD content) to connect subscribers to unauthorized streams of Plaintiffs' Copyrighted Works. The third parties behind these unauthorized streams control the facilities and equipment used to copy and stream performances of Plaintiffs' Copyrighted Works.  Those third parties directly infringe Plaintiffs' exclusive reproduction and public performance rights by copying and publicly performing the Copyrighted Works without Plaintiffs' authorization.  By operating the Infringing Services and supplying the IPTV and VOD content, Freemon facilitates, encourages, and enables the direct infringement of Plaintiffs' Copyrighted Works.

91.     If Freemon transferred the Infringing Services and/or Infringing Domains to third parties (including the Infringing Domain Defendants) as he claims, he also materially contributed to the infringement of those third parties through this illicit transfer.  Freemon knows that the Infringing Services infringe Plaintiffs' copyright by performing the Copyrighted Works, and he intentionally transferred the domains to third parties knowing they will directly infringe Plaintiffs' Copyrighted Works and profit from the infringement.  Freemon further contributed to the infringement by shielding the identities of the Infringing Domain Defendants from Plaintiffs.

92.     Freemon's knowing and material contribution to the infringement of Plaintiffs' rights in each Copyrighted Work constitutes a separate and distinct act of infringement.

93.     Freemon's knowing and material contribution to the infringement of the Copyrighted Works is willful, intentional, purposeful, and in utter disregard of Plaintiffs' rights.

94.     As a direct and proximate result of Freemon's infringement, Plaintiffs are entitled to damages and Freemon's profits in amounts to be proven at trial.

95.     Pursuant to 17 U.S.C. § 503 and at their election, Plaintiffs are entitled to an order that Defendants' infringing goods and articles be impounded and destroyed.

96.     At their election, Plaintiffs are entitled to statutory damages, up to the maximum amount of $150,000 per infringed work, by virtue of Freemon's willful infringement, or for such other amounts as may be proper under 17 U.S.C. § 504.

97.     Plaintiffs further are entitled to recover their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

98.     As a direct and proximate result of the foregoing acts and conduct, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, Freemon will continue to infringe Plaintiffs' rights in the Copyrighted Works.  Plaintiffs are entitled to injunctive relief under 17 U.S.C. § 502, including enjoining any use or exploitation by Defendants of their Infringing Services.

## COUNT III
### INDUCED COPYRIGHT INFRINGEMENT
### [Against Freemon Defendants]

99.     Plaintiffs incorporate herein by reference each and every averment contained in paragraphs 1 to 74 inclusive.

100.    With respect to Freemon's claims that the third parties to whom Freemon transferred the domains, and not Freemon himself, are directly infringing Plaintiffs' exclusive reproduction and public performance rights under the Copyright Act, Freemon intentionally induced such infringement.  Freemon supplies and promotes the Infringing Services, which has the singular function of connecting his customers to unauthorized online sources that copy and stream Plaintiffs' Copyrighted Works.  Freemon further intentionally induced infringement by transferring the illegal Service to the Infringing Domain Defendants and shielding their identities.

101.    In addition, Freemon intentionally induces the infringement of Plaintiffs' exclusive rights under the Copyright Act by recruiting third parties to resell the Infringing Services (through Live TV Resellers) and then supplying the content to these third parties knowing it to be the infringing activity.

102.    Freemon's intentional and knowing inducement of the infringement of each Copyrighted Work constitutes a separate and distinct act of infringement.

103.    Freemon's inducement of the infringement of the Copyrighted Works is willful, intentional, purposeful, and in disregard of and with indifference to Plaintiffs' rights.  Freemon also knows that the conduct by him and third parties is infringing.

104.    Pursuant to 17 U.S.C. § 503 and at their election, Plaintiffs are entitled to an order that Defendants' infringing goods and articles be impounded and destroyed.

105.    As a direct and proximate result of the infringement that Freemon intentionally induces, Plaintiffs are entitled to damages and Freemon's profits in amounts to be proven at trial.

106.    Alternatively, at their election, Plaintiffs are entitled to statutory damages, up to the maximum amount of $150,000 per infringed work, by virtue of Freemon's willful infringement, or for such other amounts as may be proper under 17 U.S.C. § 504.

107.    Plaintiffs further are entitled to recover their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

108.    As a direct and proximate result of the foregoing acts and conduct, Plaintiffs have sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, Freemon will continue to infringe Plaintiffs' rights in the Copyrighted Works.  Plaintiffs are entitled to injunctive relief under 17 U.S.C. § 502, including enjoining any use or exploitation by Defendants of their Infringing Services.

## VIII.
## JURY DEMAND

109.    Pursuant to Rule 38(b), Plaintiffs hereby demand a trial by jury on all claims, issues, and damages so triable.

## IX.
## REQUEST FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully requests judgment against Defendants for the following relief:

1.    For injunctive relief (a) enjoining Defendants and their officers, agents, servants, employees, attorneys, and all persons acting in active concert or participation with them, from publicly performing, reproducing, distributing, or otherwise infringing in any manner (including without limitation by materially contributing to or intentionally inducing the infringement of) any of Plaintiffs' rights under the Copyright Act in any of the Copyrighted Works, including without limitation by publicly performing or reproducing those Copyrighted Works, or by distributing any software or providing any service or device that does or facilitates any of the foregoing illegitimate acts; and (b) impounding hardware in Defendants' possession, custody, or control, and any and all documents or other records in Defendants' possession, custody, or control relating to their direct and secondary infringement of the Copyrighted Works.

2.    For entry of an injunction enjoining the domain name registrar for the Infringing Domains, as well as all others who receive notice of the Court's order, from allowing the Infringing Domains to be modified, sold, transferred to another owner, or deleted.

3.    For entry of an order requiring Freemon to transfer the Infringing Domains as well as all others who receive notice of the Court's order, to transfer these domain names and any additional domain names found to be associated with Freemon's operation of the infringing services to a registrar to be appointed by Plaintiffs to re-register the domain names in Plaintiffs' names, or the name(s) of their designee(s), and under Plaintiffs' ownership.

4.    For entry of an order requiring that Defendants' infringing goods and articles be impounded and destroyed pursuant to 17 U.S.C. § 503.

5.    For Plaintiffs' damages and Defendants' profits in such amount as may be found; alternatively, at Plaintiffs' election, for maximum statutory damages or for such other amounts as may be proper pursuant to 17 U.S.C. § 504(c).

6.    For an accounting, the imposition of a constructive trust, restitution of Defendants' unlawful proceeds from copyright infringement, and damages according to proof.

7.    For a declaration that Defendants' activities as alleged herein constitute direct and secondary copyright infringement of Plaintiffs' exclusive rights under copyright in violation of 17 U.S.C. § 106.

8.    For prejudgment interest according to law.

9.    For Plaintiffs' attorneys' fees and full costs incurred in this action pursuant to 17 U.S.C. § 505.

10.    For all such further and additional relief, in law or in equity, to which Plaintiffs may be entitled or which the Court deems just and proper.

DATED:  March 27, 2024

*/s/ Rose L. Ehler*
Rose Leda Ehler
Cal. State Bar No. 296523 (*pro hac vice* forthcoming)
Rose.Ehler@mto.com
Lorraine L. Abdulahad
Cal. State Bar No. 349971 (*pro hac vice* forthcoming)
Lorraine.Abdulahad@mto.com

**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702


*/s/ Jeffrey S. Lowenstein*
Jeffrey S. Lowenstein
Tex. State Bar No. 24007574
jlowenstein@bellnunnally.com
Brent A. Turman
Tex. State Bar No. 24077506
bturman@bellnunnally.com
Christian Cowart
Tex. State Bar No. 24105748
ccowart@bellnunnally.com

**BELL NUNNALLY & MARTIN LLP**
2323 Ross Avenue, Suite 1900
Dallas, Texas 75201
(214) 740-1400 Telephone
(214) 740-1499 Facsimile

**ATTORNEYS FOR PLAINTIFFS**