IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| AMAZON CONTENT SERVICES, LLC, *et al.*, § § § PLAINTIFFS, § § § § § § § § § § § § § § § § v. WILLIAM FREEMON, *et al.*, DEFENDANTS. | CASE NO. 3:24-CV-733-L (BK) |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. § 636(b) and the district judge's *Order of Reference*, Doc. 36, this matter was referred to the undersigned magistrate judge for pretrial management. Before the Court is *Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction Due to Lack of Standing*,[1] Doc. 87. For the reasons outlined below, Defendant's motion should be **DENIED.**

---

[1] The instant motion is untimely, having been filed many months after the expiration of the Court's deadline to file Freemon's amended answer or risk default judgment, Doc. 24 at 3, and after the Clerk's entry of default against Freemon and his co-defendants, Doc. 55. *See* the undersigned's Findings, Conclusions and Recommendation on *Defendant's Motion to Set Aside Clerk's Entry of Default*, Doc. 83, also filed this day. And while the undersigned recommends that Freemon's motion to set aside default be denied, the Court is nevertheless obliged to consider his arguments that the Court lacks jurisdiction. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction, *see* FED. RULE CIV. PROC. 12(b)(1), may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment.").

## I. BACKGROUND

In this copyright infringement action, Plaintiffs—producers and distributors of filmed entertainment—allege that Defendant William Freemon ("Freemon") and his company, Freemon Technology Industries LLC ("FTI LLC"), operate "an extensive and commercially scaled network of illegal streaming services" that infringe upon Plaintiffs' copyrighted works on a "massive scale." Doc. 1, ¶¶ 3, 41.

Plaintiffs assert that Freemon's infringement began when, between 2016 and 2019, he sold "illegally modified Fire TV Stick devices" through two websites: firesticksloaded.biz and firesticksloaded.com (the "Firesticks Loaded websites"). Doc. 1, ¶ 32. According to the complaint, these devices connected to a user's television and enabled them to access unauthorized content. Doc. 1, ¶ 32. Plaintiffs further allege that Freemon promoted the devices on his personal Facebook and Twitter accounts, advertising them as "loaded" and "jailbroken" and directing buyers to the Firesticks Loaded websites. Doc. 1, ¶¶ 33–34 (Figs. 2–3). Records for firesticksloaded.biz reportedly list William Freemon as the website's registrant and the listed address matches the principal place of business for FTI LLC and Freemon's alleged current residence. Doc. 1, ¶ 35 (Fig. 4).

According to Plaintiffs, Freemon's connection to these early Firesticks Loaded websites ultimately revealed his role in a "web of online infringing domains and services." Doc. 1, ¶ 37. In 2020, Freemon allegedly transitioned his early business model and began promoting a live TV subscription alternative. Doc. 1, ¶ 43. Plaintiffs contend that, since that time, Freemon has owned and operated, or continues to own and operate, four unauthorized online streaming services—Streaming TV Now, TV Nitro, Instant IPTV, and Cash App IPTV—along with a reseller service, Live TV Resellers (collectively, the "Accused Services"). Doc. 1, ¶ 20.

Plaintiffs allege that the Accused Services provide users access to thousands of live television channels through an Internet Protocol Television ("IPTV") service[2] and more than 27,000 movies and 9,000 television series through a video-on-demand ("VOD") service, including works identified by Plaintiffs as their copyrighted content.  Doc. 1, ¶ 20.

Based on these alleged activities, Plaintiffs assert claims for direct and secondary copyright infringement under the Copyright Act (17 U.S.C. § 101 *et seq*.) against Freemon and the websites and domains through which he allegedly offers the infringing services.  Doc. 1, ¶¶ 75-108.  Freemon, proceeding without the assistance of counsel, moves to dismiss the complaint for lack of subject matter jurisdiction on grounds that Plaintiffs lack Constitutional standing to assert their claims.[3]  Doc. 87.  Plaintiffs have filed a response, Doc. 103, and the time for Freemon to file a reply has long since expired.  *See* N.D. Tex. Local Rule 7.1(f) (permitting a reply brief within 14 days after a response is filed).  Accordingly, the motion is ripe for review.

## II. APPLICABLE LAW

A motion to dismiss under Rule 12(b)(1) challenges a federal court's subject matter jurisdiction.  FED. R. CIV. P. 12(b)(1).  "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate [it]." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted).  In ruling on a 12(b)(1) motion, the court may base its disposition on "(1) the complaint

---

[2] Evidence submitted by Plaintiffs describes IPTV as "a way to deliver pre-programmed linear channels of television content over the internet, as opposed to traditional cable, satellite or terrestrial formats." Doc. 76-5, ¶ 5 n.2.

[3] Although Freemon moves to dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(h)(3), that rule addresses the Court's continuing obligation to dismiss an action if at any time it determines that subject matter jurisdiction is lacking.  Doc. 87; *see* FED. R. CIV. P. 12(h)(3).  Because Rule 12(b)(1) is the proper procedural vehicle for a party seeking to dismiss for lack of subject-matter jurisdiction, the Court construes the motion as brought under 12(b)(1).

alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (citation omitted). The party asserting jurisdiction "constantly bears the burden of proof that jurisdiction does in fact exist." *Raj v. La. State Univ.*, 714 F.3d 322, 327 (5th Cir. 2013).

Article III of the Constitution confines the subject-matter jurisdiction of federal courts to the resolution of "Cases" and "Controversies." U.S. Const. art. III, § 2. "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Raines v. Byrd*, 521 U.S. 811, 820 (1997)). To demonstrate Article III standing, the party invoking federal jurisdiction must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Moreover, a plaintiff who seeks injunctive relief must also show "a significant possibility of future harm; it is insufficient to demonstrate only past injury." *Segovia v. Admiral Realty, Inc.*, No. 21-CV-2487, 2022 WL 3104849, at *2 (N.D. Tex. Aug. 4, 2022) (Lindsay, J.) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974)).

"[E]ach element of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, with the same evidentiary requirements at that stage of litigation." *Inclusive Cmtys. Project, Inc. v. Dep't Treas.*, 946 F.3d 649, 655 (5th Cir. 2019) (citation omitted). Thus, at the pleading stage, the party invoking jurisdiction must "clearly . . . allege facts demonstrating" each element. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), *as revised* (May 24, 2016) (citation omitted). "Failure to establish any one [of the

elements] deprives the federal courts of jurisdiction to hear the suit." *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002).

### III. ANALYSIS

Freemon's argument that Plaintiffs' lack Article III standing centers on the causation requirement. Doc. 87 at 1-2. Specifically, Freemon argues that Plaintiffs have failed to "connect him to any infringing activity" and therefore have not shown any "concrete or particularized injury [that is] traceable to him." Doc. 87 at 1; Doc. 88 at 2. The Court disagrees.

To satisfy the standing doctrine's causation requirement, a plaintiff's alleged injury must be "fairly traceable to the challenged conduct of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up). Although Article III requires a "causal connection between the injury and the conduct complained of," the defendant's actions need not be "the very last step in the chain of causation." *Id; Bennett v. Spear*, 520 U.S. 154, 169 (1997). Nor is a showing of proximate cause required. *Inclusive Cmtys.*, 946 F.3d at 655. "Causation, for example, isn't precluded where the defendant's actions produce a 'determinative or coercive effect upon the action of someone else,' resulting in injury." *Id.* (quoting *Bennett,* 520 U.S. at 169). To satisfy the traceability requirement and survive a motion to dismiss for lack of standing, "plaintiffs must only establish a line of causation between defendants' action[s] and their alleged harm that is more than attenuated.'" *Turnbow v. Life Partners, Inc.*, No. 3:11-CV-1030, 2012 WL 4473080, at *6 (N.D. Tex. Sept. 28, 2012) (Lynn, J.) (citing *Maya v. Celotex Corp.*, 658 F.3d 1060, 170 (9th Cir. 2011)).

Here, Plaintiffs have adequately alleged concrete and particularized injuries that are fairly traceable to Freemon's conduct. The complaint alleges that Freemon "owns and operates"

several IPTV services which offer "similar infringing content": (1) Streaming TV Now; (2) Instant IPTV; (3) Cash App IPTV; (4) Nitro TV; and (5) Live TV Resellers (collectively, the "Accused Services").  Doc. 1, ¶ 37.  Given the scope and structure of the alleged operation, limited background regarding how the Accused Services function is helpful to assessing their alleged connection to Freemon.  The operation of the Accused Services is described in detail in the declaration of Plaintiffs' "IPTV expert," Nigel Jones.  Doc. 92-1, ¶¶ 10-16 (Pls.' App'x 18).

According to Jones, each of the Accused Services maintained a "front-end website" which included a homepage that "described the Service's content offerings and pricing structure and linked to the Services' purchase page."  Doc. 92-1, ¶ 11.  Once a customer paid for a subscription, the Service's front-end website would provide the user access to the Services' web player through a link or would direct the user to download a media-player application.  Doc. 92-1, ¶ 11.  Users who clicked the web player link on three of the Accused Services' front-end websites (Streaming TV Now, Instant IPTV, and Cash App IPTV) would be taken to a different domain: stncloud.ltd.[4]  Doc. 92-1, ¶ 12.  Alternatively, users who downloaded a third-party media-player application were instructed to connect the media-player to a "socket," stnlive.ltd.80, which in turn connected the user back to the IPTV service's (e.g., Streaming TV Now's) back-end server.  Doc. 92-1, ¶ 12.  Plaintiffs allege that the "back-end" domain (stncloud.ltd) and "back-end" server (stnlive.ltd.80) are where subscribers reached the infringing content.  Doc. 91 at 6.  Once subscribers entered the subscription credentials provided by the Accused Services' front-end websites into the back-end server or domain, they were purportedly

---

[4] The fourth Accused Service, TV Nitro, did not have a link to a web player on its website but is alleged to have been an early iteration of Streaming TV Now, which introduced the web player streaming option in 2021.  Doc. 92-2, ¶ 12 n.5.

granted access to "thousands" of live channels and video on demand content, including more than 27,000 movies and 9,000 television series. Doc. 1, ¶ 6.

Plaintiffs have also alleged extensive facts that show Freemon owned and operated the Accused Services. First, as Plaintiffs point out, Freemon admitted in a court filing that he owned Streaming TV Now's front-end domain until at least September 2021. See Doc. 27 at 2. Although he alleges that he transferred ownership of the domain in September 2021, Plaintiffs argue that other facts, along with his failure to produce evidence of the transfer, suggest that he retained control of the domain after that time. Doc. 103 at 11. In particular, Plaintiffs allege that one of Freemon's "Firesticks Loaded" websites, which was registered under his name and address and which he actively promoted on his personal social media accounts, included a link to Streaming TV Now on its homepage until it went offline in late 2022. Doc. 103 at 11.

Plaintiffs also point to evidence from the Accused Services' themselves, which indicate Freemon's involvement. Doc. 103 at 11; Doc. 92-1, ¶¶ 56-62. First, according to Jones, all of the Accused Services' tutorial pages included an instructional video titled "Amazon One-Click Purchase Failure Fix," during which the video's narrator logs into an Amazon account under the name "William Freemon." Doc. 92-1, ¶ 61. Moreover, screenshots of the Accused Services' homepages show that Streaming TV Now, Instant IPTV, CashApp IPTV, and Nitro TV all advertised an identical pricing structure and used identical language to describe their content packages. See Doc. 76-5 at 85-88 (Pls.' Ex. 16); Doc. 76-6 at 2-35 (Pls.' Exs. 17-21).

Jones also notes multiple instances in which the Services "referred to each other as interchangeable versions of the same service." Doc. 92-1, ¶ 38. For example, in 2021, TV Nitro announced its move to a new site which linked to Instant IPTV. See Doc. 76-5 at 73-74 (Pls.' Ex. 13). In 2022, Instant IPTV's homepage referred to its service as "Streaming TV Now," and

in 2024, Cash App TV likewise inadvertently identified itself on its homepage as Streaming TV Now. *See* Doc. 76-5 at 85-88 (Pls. Ex. 16); Doc. 76-5 at 23, ¶ 36. Similarly, in 2021, both Streaming TV Now and the Live TV Reseller websites contained links to one another, offering users the opportunity to purchase bundles of subscription credits for Streaming TV Now to be sold to downstream consumers. Doc. 76-5, ¶¶ 21-24. This extensive overlap among the Accused Services supports the inference of common ownership, and Freemon's admitted ownership of Streaming TV Now permits a reasonable inference that he controlled the remaining services.

Despite these allegations—which represent only a portion of the facts connecting Freemon to the Accused Services—Freemon argues that Plaintiffs have failed to connect him to any *infringing* content. Doc. 87 at 1-2. In support of his argument, Freemon relies on screen-capture videos produced by Plaintiffs during discovery. Doc. 87 at 1-2. These videos, which have since been manually submitted to the Court, *see* Doc. 93,[5] purport to show investigators "(1) accessing each [i]nfringing Service, (2) browsing the Service's menu of illicit television channels and motion pictures, and (3) streaming specific copyrighted works." Doc. 103 at 13. Freemon argues, however, that the videos actually show infringing content being accessed through "different URLs not tied to [him] or the listed sites" and that this "disconnect confirms that [Plaintiffs'] claims are not traceable" to him. Doc. 87 at 2.

---

[5] Freemon's screenshots are taken from the initial version of the discovery videos, which contained narrow redactions intended to "conceal personal identifying information and protect investigator confidentiality." Doc. 103 at 10. After learning that the redactions had "inadvertently obscured URLs at short points in the ten-to-twenty" minute videos, Plaintiffs amended their production to remove the inadvertent redactions and reproduced the videos to Freemon on July 29, 2025. Doc. 104 at 14 (Pls.' App. 14). Those amended videos were later filed with the Court. *See* Doc. 93.

Freemon provides five screenshots from the videos, which he argues show "[d]iscrepancies in URLs used to access IPTV content." Doc. 87 at 5-9. However, even without the videos, the Court concludes that Plaintiffs have more than met their burden to "clearly . . . allege facts demonstrating" his connection to the infringing content. *Spokeo, Inc.*, 578 U.S. at 339. Further, they submit declarations that independently corroborate what the Complaint alleges: that Freemon advertised and sold illicit IPTV subscriptions through his front-end domains (e.g., Cash App IPTV, Instant IPTV, Streaming TV Now), and then provided subscribers access to the infringing content through back-end web players (e.g., stncloud.ltd) and third party media players via sockets (e.g., stnlive.ltd.80) which in turn connected the third-party player back to Freemon's back-end server. *See* Doc. 1, ¶¶ 47-48 & n.12; Doc. 92-1, ¶¶ 10-46; Doc. 75-6.

Moreover, to the extent Freemon argues that there is insufficient evidence linking him to the back-end domains and servers, this argument fails for two reasons. First, Plaintiffs have alleged multiple facts linking Freemon to the back-end sites, supported by declarations from Nigel Jones and Dani Bacsa, Deputy Chief of Content Protection at the Motion Picture Association. Doc. 92-1; Doc. 75-6. As noted above, Streaming TV Now's, Cash App IPTV's, and Instant IPTV's front-end websites all ultimately linked to a web player hosted at the domain stncloud.ltd. Doc. 92-1, ¶¶ 40-41. Similarly, these three Services directed subscribers to access application-based streams through the same socket, stnlive.ltd, at some point in time. Doc. 92-1, ¶¶ 43. That three of the four Accused IPTV Services directed subscribers to the same back-end locations suggests that the Services were interconnected and that their common—Freemon—likewise controlled those back-entry points. Doc. 92-1, ¶ 43.

Even more compelling is the connection between the Internet Protocol ("IP") address histories of the Accused Services and the back-end sites. Plaintiffs explain that:

> An IP address is a unique label that identifies a device connected to the internet. Like a street address tells mail carriers where to deliver mail, an IP address tells computers and other devices where to send and receive information over the internet. Any device that connects to the internet, such as a computer or a server, gets assigned an IP address. If one server hosts multiple websites, the websites all share the server's IP address.

Doc. 1, ¶ 36. Plaintiffs contend, and the Jones and Bacsa declarations corroborate, that all five Accused Services, as well as the domain stncloud.ltd, were hosted, for a period of time, at the same IP address: 5:183.209.216.[6] Doc. 1, ¶¶ 36-37; Doc. 92-1, ¶ 30; Doc. 75-6, ¶ 12. Jones avers that because the Services' front-end websites and web player shared this IP address, they resided on the same server and were "very likely" managed by a single individual or entity renting that server. Doc. 92-1, ¶ 31. Notably, the Firesticks Loaded website—the site most directly tied to Freemon—also operated via this same IP address and server. Doc. 75-6, ¶ 12. Taken together, these facts establish a reasonable likelihood that Freemon is the single individual who managed both the Accused Services and their back-end counterparts.

Second, even absent evidence linking Freemon to the back-end domains, Plaintiffs would still have standing because they assert both direct and secondary copyright claims. Doc. 1, ¶¶ 75-108. As described above, Plaintiffs have alleged extensive facts suggesting that Freemon owned, controlled, and publicly promoted the front-end domains where users subscribed, paid for, and were directed to infringing content. Doc. 1, ¶¶ 37-69; Doc. 103 at 16. By controlling the front-end domains—a fact Freemon does not dispute in the instant motion—

---

[6] The only domain that was never hosted at the 5:183.209.216 IP address is the stnlive.ltd URL used to access streams via applications. Doc. 75-6, ¶ 12 n. 3. According to Bacsa, however, this URL can be linked to Streaming TV now and the web player stncloud.ltd, which in turn have all been linked to the 5:183.209.216 address. Doc. 75-6, ¶ 12 n. 3.

Freemon facilitated user access to the infringing content, supporting Plaintiffs' contributory copyright claim that he "knowingly and materially" contributed to the infringement. Doc. 1, ¶ 88. Accordingly, even without a direct connection to the back-end domains, Plaintiffs have alleged injuries that are "fairly traceable" to Freemon's conduct. *Lujan*, 504 U.S. at 560.

In short, Plaintiffs have sufficiently established a "line of causation" between Freemon's conduct and their alleged harm that is "more than attenuated." *Turnbow*, 2012 WL 4473090, at *6. Through his alleged ownership of the Accused Services' front-end websites and the Services' links to back-end servers hosting infringing content, Plaintiffs have shown an injury-in-fact that can be fairly traced to Freemon. *Lujan*, 504 U.S. at 560. Moreover, Freemon's continued ownership of the Services demonstrates "a significant possibility of future harm." *Segovia*, 2022 WL 3104849, at *2. These allegations are more than sufficient to withstand Freemon's Rule 12(b)(1) motion to dismiss for lack of standing.

## IV. CONCLUSION

For the foregoing reasons, *Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction Due to Lack of Standing*, Doc. 87, should be **DENIED**.

**SO RECOMMENDED** on February 24, 2026.

_____
RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation will be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). An objection must identify the finding or recommendation to which objection is made, state the basis for the objection, and indicate where in the magistrate judge's report and recommendation the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).